Filed 3/14/22  In re A.G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | H049183<br>(Monterey County<br>Super. Ct. No. 18JD000104) |
| MONTEREY COUNTY DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.B.,<br><br>Defendant and Appellant. | |

On July 24, 2018, the Monterey County Department of Social and Employment Services (Department) filed a petition under Welfare and Institutions Code section 300, subdivisions (b)(1)[1] relative to a boy, A.G. (the minor), who was then four years old. S.B. (mother) is the minor's mother. The minor was placed into protective custody after mother, twice in successive days, drove a car under the influence with the minor as her passenger. The Department alleged that mother had a "severe" ongoing substance abuse

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

problem that prevented her from adequately caring for the minor. The juvenile court declared the minor a dependent child, and he was placed in out-of-home foster care. Mother received family reunification services for 13 months; they were terminated in September 2019.

The initial selection and implementation hearing pursuant to section 366.26 (366.26 hearing) occurred in January 2020. Mother requested a contested hearing on the potential application of two statutory exceptions to adoption, namely, (1) the parental-benefit exception (see § 366.26, subd. (c)(1)(B)(i)), and (2) the sibling relationship (see *id.*, subd. (c)(1)(B)(v)). In response to the juvenile court's request, mother provided oral and written offers of proof of the evidence she intended to present in support of the two exceptions. At the 366.26 hearing on January 28, 2020, the juvenile court found mother's offer of proof insufficient, denied her request for a contested hearing on the exceptions, found the minor adoptable, and terminated parental rights.

Mother appealed that order, contending the juvenile court denied her due process by rejecting her request for a contested hearing concerning the potential applicability of the parental-benefit exception. On December 18, 2020, this court, without addressing the merits of mother's claim that the exception applied, reversed and remanded. We directed that the juvenile court further consider the legal sufficiency of mother's offer of proof in support of the parental-benefit exception, construe liberally mother's offer of proof, permit further argument, and, in its discretion, permit mother to amend her prior offer of proof to specify anticipated evidence that was consistent with her prior offers of proof. (See *In re A.G.* (2020) 58 Cal.App.5th 973, 1014, 1015 (*A.G.*).)

On remand, the juvenile court granted mother's request for a contested hearing. At the time of the hearing, the minor was nearly seven years old. On April 27, 2021, after receiving evidence and hearing argument, the court held that mother had failed to meet her burden of proving the applicability of the parental-benefit exception. It

reinstated its order declaring adoption to be the permanent plan and terminating mother's parental rights.

Mother appeals the court's order of April 27, 2021. She argues that the juvenile court applied an incorrect legal standard and thus abused its discretion in denying her claim of the parental-benefit exception to adoption. She asserts that the court concluded erroneously that to establish the exception, mother was required to prove that she played "a significant parental role" in the minor's life. Mother argues that, as clarified by the California Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), a case filed on May 27, 2021, one month after the second 366.26 hearing below, a parent seeking to apply the parental-benefit exception need not show that he or she occupies a parental role in the child's life.

We conclude, based upon the standards explained by the Supreme Court in *Caden C.* (decided after the hearing conducted below), that the trial court erred. But we find the error harmless. Accordingly, we will affirm the juvenile court's order of April 27, 2021, in which the court denied mother's claim of the parental-benefit exception and reinstated the order declaring adoption the permanent plan and terminating parental rights.

## I.     FACTS AND PROCEDURAL HISTORY[2]

### A.     The Minor's Detention (July 2018)

On July 24, 2018, the Department filed a petition under section 300, subdivision (b)(1) relative to the minor, who was then four years old. Prior to the Department's intervention, the minor was living with mother. The minor's father was deceased. Mother's two older children (the minor's half-sisters) resided with the maternal grandparents; the children were reported as not needing court protection.

---

[2] The factual and procedural history through January 28, 2020, presented here are taken from our opinion in *A.G.*, *supra*, 58 Cal.App.5th at pages 983 to 992. On our own motion, we take judicial notice of that opinion, as well as the appellate record and briefs filed in that prior appeal. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

It was alleged that mother had an ongoing substance abuse problem. Since February 2018, she had been living at Pueblo Del Mar, a sober living environment/transitional housing program. Mother had tested positive for amphetamine and methamphetamine on July 9, 2018. On July 19, mother drove under the influence with the minor in the car. The next day, mother drove under the influence to Genesis House, a drug treatment facility, again with the minor in the car; she had a container of vodka and Kool Aid in the car. It was also reported that mother left the minor alone in the car on occasions so that she could gamble. The Department noted that the minor had been observed to mimic mother's aggressive behaviors by "telling people to 'fuck off' and 'flipping them off.' "

On July 20, Genesis House advised the Department that it would accept mother into its residential treatment program—one in which mother had previously participated before transitioning to Pueblo Del Mar. The minor would not be allowed to stay with mother because she was unable to care for him.

It was also reported that there had been 10 referrals to the Department regarding the family over the past 10 years, due to mother's substance abuse and untreated mental health issues. Her problems included use of methamphetamine while pregnant with the minor, driving under the influence with her children in the car, and aggressive behavior in the children's presence. Mother also had a criminal history (unlicensed driving, transportation/sale of controlled substances, domestic violence, and forgery) that impaired her ability to adequately care, supervise, and protect the minor.

The juvenile court ordered the minor detained on July 25, 2018.

**B.     Jurisdiction/Disposition Hearing (August 2018)**

The Department reported that the minor was residing with a foster family in Salinas that was a concurrent home. Supervised visitation between mother and the minor had gone well. Mother had demonstrated that she had good parenting skills when she was sober, and that she appeared to have a healthy attachment to the minor.

4

At the uncontested jurisdiction/disposition hearing on August 28, 2018, the juvenile court found the allegations of the petition true and that the minor was a person described under subdivisions (b)(1) of section 300. The juvenile court ordered the minor placed in the care, custody, and control of the Department, with mother to receive visitation and family reunification services.

### C.    Six-Month Review (February 2019)

In a six-month review hearing report, the Department advised that the minor continued to live in a concurrent foster home in Salinas. The minor said that he felt happy in his placement but that he wanted to live with mother.

The Department reported that mother had been discharged from the sober living environment (SLE) in which she had resided "on February 14, 2019[,] following numerous relapses." While staying at Genesis House, she had negative drug tests in 2018 on September 15 and October 6. She had failed drug tests on November 21, 2018, January 14 and 29, 2019, and February 12, 2019, testing positive for methamphetamine, and she had failed to appear for a scheduled drug test on February 4, 2019. Her attendance at Narcotics Anonymous (NA) meetings was inconsistent, and she indicated a lack of confidence in the utility of such meetings and the 12-Step Program.

Mother had completed a mental health assessment in October 2018. She "was diagnosed with Major Depressive Disorder and Substance Abuse Disorder." Mother was assigned to a therapist and attended five sessions between October 23 and December 21, 2018. After the therapist returned from a leave of absence, mother failed to appear for three January appointments.

Mother attended supervised visits with the minor two times per week, having progressed from once a week in October 2018 after completing the Genesis House recovery program. The visits had gone well, and mother had been observed validating the minor's feelings and engaging in age-appropriate activities with the minor, including reading, drawing, and playing. Visits were moved to the maternal grandmother's home

5

in November 2018 to permit visits with the minor's two sisters. Because of mother's relapses, the Department in February 2019 modified visitation to resume fully supervised visits.

At the six-month review hearing on February 26, 2019, the juvenile court found that continued need for protective care of the minor was required.

### D.    Twelve-Month Review (September 2019)

The Department advised in its 12-month review hearing report that the minor continued to reside and do well in a concurrent licensed foster home in Salinas. He had expressed feelings of being happy in his foster home. The minor participated in weekly therapy. It was reported that he was " 'preoccupied with his mother's well-being' and ha[d] taken a role of being the caregiver to his mother as he [sought] reassurance that she [would] be safe once visits [were] over."

It was reported by the Department that mother continued to relapse. She refused to submit to random drug tests in March, April, and June, admitting that the tests were " 'going to be dirty.' " Her participation in other aspects of her case plan, including attending meetings with an assigned therapist, was inconsistent. At an April 15 team meeting, mother told the Department that " 'there is not much progress' " to report concerning her sobriety. When asked what the Department could do to support her, mother responded " 'there's nothing you guys can do[;] you have done enough.' " She also told the representatives of the Department: " 'I am not doing another program. Otherwise I would live at a fucken program, hearing the same shit over and over, doesn't help me . . . meetings don't work for me . . . I don't have to stay clean to get my son[.] I am not going to jail; I am not on probation. . . .' "

Mother's visitation with the minor during the review period was not uniformly positive. She complained frequently about the visits being supervised, and her visits never progressed to unsupervised status. Mother: struggled to read the minor's cues; frequently did not provide appropriate structure during visits, leaving the minor

6

unattended; failed to address an instance in which the minor took a lighter from her purse; often raised issues that upset the minor (e.g., his deceased father); was combative toward the visitation supervisor; and made negative and critical remarks in front of her son, such as " 'CPS are a bunch of assholes' " and " '[t]hese visiting moms are disgusting.' "

At a contested 12 -month review hearing on September 20, 2019, the juvenile court terminated mother's reunification services, and it scheduled a 366.26 hearing for January 14, 2020.

### E.    Department's Section 366.26 Report (December 2019)

The Department reported in connection with the 366.26 hearing that the minor continued to do well in his placement in a Salinas concurrent foster home and was comfortable living with his foster family. The minor knew that "he [was] in a nurturing and caring home environment." The minor was too young to understand the concept of adoption. He "continue[d] to hope to return to the care of his mother, but he seem[ed] to understand that he [would] stay with the prospective adoptive parents."

During the review period, mother's supervised visits with the minor "taper[ed] down to once a month." Mother had been "appropriate" during the visits, and she had been making a better effort in planning for the visits.

The Department recommended that the parental rights of mother be terminated, and that a permanent plan of adoption for the minor be established.

### F.    Hearings Pursuant to Section 366.26

#### 1.    Initial Hearing (January 14, 2020)

At the initial hearing on January 14, 2020, mother requested that the case be set for a contested hearing, her counsel indicating that mother was asserting the applicability of the parental benefit and the sibling relationship exceptions to adoption. The court, at the Department's request, required that mother submit an offer of proof in support of her claim that these exceptions to adoption applied. The court found the minor adoptable.

7

But it granted a continuance to afford mother's counsel "an opportunity to present his specific articulable offer of proof" in writing to support mother's claimed exceptions to adoption. Mother submitted a written offer of proof on January 23, 2020, which identified nine witnesses who would be available to testify at the 366.26 hearing.

### 2. Further 366.26 Hearing (January 28, 2020)

The juvenile court conducted a further 366.26 hearing on January 28, 2020. The juvenile court found that mother's offer of proof was insufficient to warrant the granting of an evidentiary hearing concerning the parental benefit and sibling relationship exceptions to adoption. The court then made findings that the minor was adoptable, and that he was placed in a prospective adoptive home. The court ordered that adoption was the permanent plan for the minor, and it terminated mother's parental rights.

### 3. First Appeal (Opinion Filed December 18, 2020)

Mother filed an appeal from the order of January 28, 2020, in which the juvenile court terminated parental rights. On December 18, 2020, this court issued its decision reversing the order. (*A.G.*, *supra*, 58 Cal.App.5th 973.) We concluded that the record showed "that (1) mother had maintained regular contact with the minor, satisfying the first component of the parental relationship exception [citation]; (2) her written offer of proof was proper in scope in that it addressed mother's regular contact with the minor and the existence of a parent-child relationship; (3) the offer of proof contained some specifics and was thus partially compliant, but it also included substantial portions that were not compliant with the specificity requirements of [*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1124]; . . . and [4] if mother were granted leave to amend, . . . she may be able to cure some of the deficiencies in her offer of proof." (*Id.* at p. 1014.) Accordingly, we reversed and remanded the matter with instructions that the court consider further whether mother's offer of proof, construed liberally and with any supplementation that the court in its discretion might permit, was legally sufficient to

8

require a contested evidentiary hearing on the parental-benefit exception to adoption.  (*Id.* at pp. 1014-1015.)**3**

### 4.   *Post-Appeal Reports*

The Department submitted a report for a January 2021 status hearing.  It advised that the minor had moved with his foster family in January 2020 to San Diego County.  The family thereafter "reported that [the minor] began to have extreme anger outbursts . . . [and] they provided a 14-day notice," presumably pursuant to section 16010.7 (concerning advance notice of a proposed foster care change).  In May 2020, the minor was placed in the Salinas home of the paternal cousin.  She was certified as a Resource Family Approval home in July 2020.  The Department reported that the minor had adjusted well to his new placement.  Since his new placement, the minor had come into contact with paternal relatives and was in consistent contact with his sisters.  The paternal cousin indicated she was willing to adopt the minor.

Additionally, the Department submitted a treatment update and progress report from the Children's Behavioral Unit of Santa Clara County Public Health Department.  The minor was referred because of adjustment difficulties stemming from the severance of his relationship with prior prospective adoptive parents in San Diego and his move in May 2020 back to Salinas to the home of a new prospective adoptive family.  The minor had participated in weekly treatment sessions beginning in September 2020, and it was reported that "positive progress toward his treatment goals" was being achieved.  The clinician reported that the minor's social and cultural history included substance abuse by his mother, her receiving intermittent substance abuse treatment in Monterey County, and

---

**3** As we noted in the prior appeal, mother expressly waived any challenge to the juvenile court's denial of a contested hearing insofar as it concerned the sibling relationship exception to adoption.  (*A.G.*, *supra*, 58 Cal.App.5th at p. 981, fn. 2.)  The juvenile court below, after remand, confirmed such waiver.  We are therefore only concerned with the court's finding, on remand after a contested hearing, that the parental-benefit exception to adoption did not apply.

the minor's having witnessed significant domestic violence between his mother and father. It was noted that the minor's father had been a gang member who had died as a result of gang violence.

The caregiver submitted a report on January 5, 2021. She reported that the minor was "doing much better in school." He had been assessed, was involved in in-person learning, and was attending an after-school program. He had received two certificates for his schoolwork. The caregiver also advised that there had been improvements in the minor's being able to express himself and to regulate his emotions. She stated that the minor was receiving weekly therapy which was helpful in regulating his feelings; he looked forward to the sessions. The minor was also doing well in bonding with the caregiver's children (ages 13 and two), and in FaceTime visits with the maternal grandparents and the minor's half-sisters.

### 5. *Contested Hearing After Remand (April 27, 2021)*

The court held a status conference on January 26, 2021, to address whether it would schedule a contested hearing. After hearing argument and submitting the matter, the court, "construing the mother's offer of proof liberally in favor of its sufficiency," exercised its discretion to schedule a contested hearing on the parental-benefit exception to adoption. The court directed mother's counsel to file an updated witness list that included a specification of the nature and relevance of the anticipated testimony of each witness.[4]

The court heard testimony and argument that spanned over four sessions between March and April 2021. In addition, the court, without objection, took judicial notice of

---

[4] At the hearing on January 26, 2021, mother's counsel requested a 120-day continuance with a reinstatement of visitation for that period. The court denied that request when it set the contested hearing. Mother does not challenge that ruling on appeal.

10

the filings made in the proceeding. Seven witnesses—six proffered by mother—provided testimony as presented below.

### a. Janet B. (Maternal Grandmother)

Janet B., the maternal grandmother, testified that mother and the minor had lived together continuously from the minor's birth until his removal. Janet B. said that mother and the minor had a normal parent-child relationship, and that mother had taken good care of the child. She was unaware that mother had driven a car with the minor while she was under the influence. Janet B. never witnessed the minor, after his removal, say anything about returning to mother. Beginning around February 2021 during the minor's visits with her, Janet B. had witnessed approximately three telephone calls between the minor and mother. The last call, occurring approximately two weeks before the hearing, ended "because [the minor] did not want to talk to his mom."

### b. Victoria K. (Friend)

Victoria K. and mother had been friends for seven to eight years. Before the minor was removed in July 2018, and in 2016 to 2017, Victoria, who was living in a residential treatment facility, would see mother (who brought the minor with her to weekly NA meetings). She testified that from her observations, mother and the minor had a "[v]ery loving, compassionate" relationship. Victoria had not seen mother and the minor together since 2016 or 2017.

### c. Taren R. (Friend)

Taren R. and mother had been friends for 10 years. She had observed mother and the minor interacting prior to his removal. She testified that they had a "very close relationship" and that the minor loved mother very much. Taren had not had seen mother and the minor together since 2017 or 2018, when the three of them were living in a residential treatment facility, Genesis House.

11

### d.     Summer K. (Sponsor)

Summer K. had been mother's sponsor since February 2017. She had seen mother and the minor together prior to his removal in July 2018. Her observations occurred between February through May 2017 and from November 2017 to January 2018, during the time mother was in a treatment facility. She believed that the minor was "attached to" mother, they had a "very close relationship," the minor was very affectionate, and he turned to mother to take care of his needs. Since October 2020, mother had been living with the witness. Summer testified that mother had been clean since October 11, 2020, and that she was on step seven of the 12-step program.

### e.     Brittney O.

Brittney O. testified that she and mother had been friends since August 2017 through NA meetings. She had observed that mother had worked hard on her sobriety since October 2020. The witness did not offer any testimony concerning mother's relationship with the minor.

### f.     S.B. (Mother)

Mother testified that the minor had been born in May 2014, and she had been his sole care provider until his removal on July 20, 2018. She cared for, housed, fed, bathed, and entertained him and gave him emotional support. The last time she had helped the minor to bed, bathed him, helped him with homework, or spoken with his teacher was in 2018.

Mother participated in supervised visits with the minor after his removal until September 2019. (There was a short period in 2018 that visits were unsupervised, but they reverted to supervised visits that were less frequent because mother had relapsed.) During the supervised visits, they talked, played games, and read books. Mother brought snacks for the minor for the visits. The minor told mother on occasion that he wanted to return to live with her.

In July 2020, mother encountered the minor and his caretaker at the store. When the minor saw mother, he ran to her, called her "Mommy," gave her a hug, and said he loved her. The minor was excited and they went to get pizza. Later the same month, the caregiver permitted mother to pick up the minor to go out to eat.[5] During that visit, the minor was happy and excited, and he told her "he's been waiting for this day."[6]

Mother testified that she was informed that the minor had received tutoring for the 2020-2021 school year. In 2020, the minor sent mother two certificates of achievement.

Mother called social worker Nayelli Julian on October 12, 2020 (on or around the date mother testified was her clean and sober date) to ask if the minor had been formally adopted. Later that year, mother called the social worker to ask if she could see the minor for Christmas. The social worker said she needed to speak with her supervisor; mother did not receive a call back concerning her request.

In February 2021, the Department reinstated telephone visits between mother and the minor. Mother had three phone visits with the minor on Sundays during his visits with the maternal grandparents and his sisters. The first call lasted 20 minutes but the last two "ended really, really quickly" because the minor had wanted to play with his sisters. During the shorter calls, the minor said he wanted to tell mother "hi" and that he loved her. After the third call, the social worker told mother that the minor wanted to

---

[5] Although of minimal significance, there is a discrepancy in the record as to whether mother saw the minor once or twice in July 2020. Mother testified that she had a chance encounter with her son at the store in July 2020, and that later the same month, with the caregiver's permission, she had pizza with the minor. Social worker Nayelli Julian testified that she understood from her conversation with the caregiver that mother had run into her son at the grocery store and after talking, mother and the minor went out for pizza.

[6] Mother testified that the minor did not explain what he meant. But mother testified that "I'm assuming [he meant] that he thought he was coming home." The court found the minor's statement to which mother testified that he had "been waiting for this day" as "leading only to speculation" as to what he meant.

13

take a break from the calls.  Mother denied that the minor ever told her he didn't want to speak with her at all.

Mother admitted that she had been addicted to methamphetamine and alcohol since approximately 2010.  Over the years, mother had lived in several residential treatment facilities, where she had followed a pattern of relapsing after completing treatment.  She resided in treatment facilities from November 2016 to May 2017; from November 2017 until February 2018; and from August 2019 to November 2019 (an instance in which she left the program early).  Mother testified that she had been clean since October 11, 2020, and she continued to work on her recovery.  She testified that she was "ready now" to maintain her sobriety.

As of the date of the hearing, mother was employed fulltime as a postal worker. She was hired in February 2021.

### g.  Nayelli Julian (Caseworker)

Social worker Nayelli Julian testified that she had been the assigned caseworker at the beginning of the case and had authored the jurisdiction/disposition and selection and implementation reports.  For a period of time not disclosed in the record, she was not the caseworker; she resumed assigned caseworker duties after mother's services were terminated in September 2019.  The court ruled that social worker Julian was qualified to provide expert testimony as an adoption social worker.

Mother's last supervised in-person visit with the minor, which "went well," was on January 2, 2020.  During the proceedings, visitation remained supervised due to mother's relapses.  After the last visit in January 2020, the minor had had no negative behaviors associated with his not seeing mother.  Social worker Julian understood that mother and the minor had a chance encounter at a store in July 2020, and that they had spoken by telephone on Thanksgiving 2020 and on New Year's Day, 2021.  In February 2021, the Department set up supervised telephonic visits between mother and the minor.  There were three supervised telephone visits, the last occurring on March 7.

14

Social worker Julian was advised that mother was appropriate during the telephone calls and that, while the minor was initially engaged, in later calls, he had indicated that he did not want to continue with them. Social worker Julian's understanding was that, in response to the Department's inquiries as to whether a different time for the visits would be preferable, the minor did not request any additional phone calls with mother.

Based upon her recent observations, social worker Julian described the relationship between mother and the minor as "a casual relationship." She testified that it was "not the typical parental [*sic*] child relationship." The social worker opined that the minor would not suffer any detriment if he were to not see mother in the future. In her opinion, mother's current relationship with the minor did not outweigh the potential benefits of adoption "[b]ecause adoption is offering him permanency and stability in his life moving forward. [¶] . . . [¶] He's had a lot of instability in his young life. And now more than before, we have seen him making a lot of progress on his wellbeing. And so with that continued permanency, consistency, and support [through adoption], he will continue to thrive."

Social worker Julian testified that the minor was "doing very well" in his current placement, and he had stated that he was happy where he was living. It was the social worker's understanding that the caregiver was responsible for providing the minor with food, clothing, shelter, bathing, comfort, guidance and discipline, medical and dental care, and ensuring that the minor's educational needs were met. The caregiver spoke with the minor's teacher and his therapist, and the minor looked to the caregiver to take care of his needs. In social worker Julian's opinion, the caregiver acted in the role as the minor's parent. From the social worker's observation, the minor was very comfortable around the caregiver and had recently become more open with her about his feelings and was becoming attached to the caregiver.

15

### h. Court's Ruling

The juvenile court announced its decision on April 27, 2021.  Noting that "the parent must establish by a preponderance of the evidence that she serves in a significant parental role," the court ruled that mother had not met her burden of proof that the parental-benefit exception to adoption was applicable.  In so concluding, the court observed that mother "ha[d] not provided the child with ongoing daily care and support." It found further that "[t]he prospective adoptive parents and the child are bonded, they are attentive to the child's needs, and they have been the ones who have nurtured the child in making behavioral improvements."  And the court held that "[o]n balance, the court finds that the strength and quality of the relationship between mother and child does not promote the child's well-being to such a degree as to outweigh the benefits he would gain in a permanent home with his prospective adoptive parents to whom he has bonded and to whom he has looked for his care, guidance and support on a daily basis."

The court ordered that the minor would continue as a dependent child and the adoption would remain as the permanent plan.  The court ordered further that the prior order of January 28, 2020 terminating parental rights be reinstated.

## II.    DISCUSSION[7]

### A.    Selection and Implementation Hearings Under Section 366.26

#### 1.    *Generally*

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the selection and implementation hearing as provided under section 366.26.  The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children."  (*Id*., subd. (b).)  As the California Supreme Court has recently explained, "[a]t the section

---

[7] Our discussion of the law presented in parts A and B is derived from this court's opinion in *In re A.L.* (2022) 73 Cal.App.5th 1131, 1149-1154 (*A.L.*).

16

366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child. [Citations.] In fact, it is not permissible to order reunification at the section 366.26 hearing. [Citations.] Indeed, when the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)

There are seven statutory choices for the permanency plan; the preferred choice is adoption, coupled with an order terminating parental rights. (§ 366.26, subd. (b); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["Legislature has thus determined that, where possible, adoption is the first choice"]; *ibid.* [where child is adoptable, "adoption is the norm"].)[8] The court selects this option if it "determines . . . by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).)

Thus, at the 366.26 hearing, "in order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. . . . '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to

---

[8] The seven choices to be made by the juvenile court at the 366.26 hearing are, in order of preference, (1) placement of the child for adoption and terminating parental rights; (2) ordering "the plan of tribal customary adoption" without termination of parental rights; (3) appointment as legal guardian(s) the relative(s) with whom the child resides at the time of the hearing, (4) without terminating parental rights, identification of adoption as the permanent placement goal where termination of parental rights would not be detrimental to the child and adoption is a probability but the child may prove difficult to place for adoption; (5) appointment of a nonrelative legal guardian for the child; (6) ordering the permanent placement of the child with a fit and willing relative, subject to periodic reviews; and (7) ordering that the child remain in foster care with periodic reviews. (§ 366.26, subd. (b)(1)-(7).)

terminate parental rights will be relatively automatic if the minor is going to be adopted.'
[Citation.]" (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250

As noted, if the court makes the two aforesaid determinations, it is required to terminate parental rights to allow for adoption of the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) But a parent may avoid this result if he or she establishes "that the termination of parental rights "would be detrimental to the child due to one or more of . . . [six statutory] circumstances." (§ 366.26, subd. (c)(1)(B).) As discussed below, one such circumstance—which is at issue here—is the parental-benefit exception.

If the juvenile court makes a finding that one of the statutory circumstances presents "a compelling reason" for determining that the termination of rights would be a detriment to the child (§ 366.26, subd. (c)(1)(B)), the court should select a permanent plan alternative to adoption. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).) "In other words, when a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.' [Citations.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

It must be emphasized, however, that the six specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53, original italics.) They " 'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*, original italics.)

### 2. *Parental Exception to Adoption*

The parental-benefit exception was asserted by mother below. Under this exception, the juvenile court will not terminate parental rights if it " 'finds a compelling

18

reason for determining that termination would be detrimental to the child . . . [because t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The Supreme Court has construed the statute to provide that there are "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Ibid.*, original italics; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576 (*Autumn H.*) [recognized by *Caden C.*, *supra*, at p. 631, as "the seminal decision interpreting the exception"].)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) " 'Sporadic visitation is insufficient.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643, disapproved on other grounds in *Caden C.*, *supra*, at p. 637, fn. 6.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating

parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.)

Therefore, as explained in *Caden C.*, "[i]n each case, . . . the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. (*Ibid.*) That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. (§ 366.26, subd. (c)(1)(B)(i), italics added.)" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

20

The Court of Appeal in *Caden C.* had reversed the juvenile court's finding of the existence of the parental-benefit exception, concluding that "because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp 625-626.) The Supreme Court held that the appellate court erred in its emphasis on the mother's noncompliance with her case plan in denying the parental relationship exception. (*Id.* at p. 626.) The high court explained: "A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception. . . . [M]aking a parent's continued struggles with the issues leading to dependency, standing alone, a bar to the exception would effectively write the exception out of the statute. . . . Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id.* at p. 637, fn. omitted.) The *Caden C.* court concluded that "the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it? The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Id.* at p. 638.)

The high court also explained that a parent's failure to demonstrate the likelihood of being able to assume a custodial role does not preclude application of the exception. It held: "[W]hether the parent is or is not 'ready for the children's return to her custody' is not, by itself, relevant to the application of the parental-benefit exception. [Citation.] If termination of parental rights would, when weighed against the offsetting benefits of an adoptive home, be detrimental to the child, the court should not terminate parental rights,

even if the parent has not demonstrated a likelihood that he or she will ever be able to regain custody. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 638, fn. omitted.)

The burden is on the parent to prove the parental-benefit exception by a preponderance of the evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Thus, "[t]he parent must show [1] regular visitation and contact with the child, taking into account the extent of visitation permitted . . . [2] the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship . . . [and 3] that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid*.)

## B. Standard of Review

In *Caden C.*, *supra*, 11 Cal.5th 614, the Supreme Court clarified the standard of review applicable for a juvenile court's finding regarding the parental-benefit exception. The high court explained that Courts of Appeal had employed three different standards: substantial evidence, abuse of discretion, and a " 'hybrid' standard . . . [in which] regular visitation and . . . [existence of] a beneficial relationship [findings are reviewed] for substantial evidence but whether termination would be detrimental [is reviewed] for abuse of discretion." (*Id.* at p. 639.) The *Caden C.* court held that the hybrid standard of review applied. (*Id.* at p. 640; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [enunciating the hybrid standard of review].)

The high court noted that the first two elements—regular visitation and a beneficial relationship—involved determinations that were essentially factual and thus should be reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) The third element—detriment to the minor resulting from termination—the Supreme Court explained, is different. Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent. (*Ibid.*) In determining detriment, however, the juvenile "court must also

22

engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

## C. The Juvenile Court Erred Under Subsequently-Decided *Caden C.*

Mother contends that the juvenile court erred in concluding that she had not met her burden of proving the parental-benefit exception to adoption. She asserts that the court found that mother was required to show that she occupied a parental role in the minor's life. Mother argues that under *Caden C.*, *supra*, 11 Cal.5th 614, there is no such requirement to establish the parental-benefit exception. She argues further that the court erred in finding the exception inapplicable based upon the conclusion that mother had not addressed fully her substance abuse issues that had resulted in the minor being declared a dependent child. Mother contends therefore that the court, by applying an incorrect legal standard in its determination that the exception did not apply, committed an abuse of discretion requiring reversal.[9]

---

[9] In its respondent's brief, the Department does not address mother's contention on appeal that the juvenile court erred by applying the wrong legal standard in concluding that she had failed to establish the parental-benefit exception. (See *County of Butte v. Bach* (1985) 172 Cal.App.3d 848, 867 [contention raised in appellant's brief to which respondent makes no reply in its brief will be deemed submitted on appellant's brief].)

23

### 1. *Regular Visitation*

The Department contends that mother did not meet her burden of proof relative to the first element of the parental benefit exception, namely, regular visitation and contact. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It contends, inter alia, mother's last authorized visit with the minor occurred in January 2020, and that her only other contacts in 2020 were a chance encounter at a store in July and a telephone call on Thanksgiving. And the Department notes that in early 2021, it "attempted to promote a relationship" by arranging three telephone calls, and after the last call, the minor did not request further contact with mother.

We note initially that the juvenile court made no express finding as to whether mother had, or had not, established the regular visitation and contact element of the exception. The juvenile court stated: "Since the time of removal, the mother's visitation has been entirely or nearly entirely supervised. Mother has had only minimal visitation for the past 15 months." The court also noted that there had been three telephone visits arranged by the Department after the issuance of this court's opinion in *A.G.*, *supra*, 58 Cal.App.5th 973. Thus, from the juvenile court's comments, it cannot be determined whether it found mother had satisfied the regular visitation and contact element of the exception. (See *A.L.*, *supra*, 73 Cal.App.5th at p. 1156 [juvenile court is not required to "recite specific findings relative to its conclusions regarding any or all of the three elements of the exception"].)

In the first appeal, this court observed that at the time of the prior 366.26 hearing in January 2020, "the Department conceded . . . that mother [had] maintained regular visitation with [the minor]." (*A.G.*, *supra*, 58 Cal.App.5th at p. 1006.) And to the extent the Department urges that mother failed to show regular visitation and contact between the date of the last visit in January 2020 through the end of 2020, this argument ignores the circumstances that (1) the juvenile court terminated mother's parental rights on January 28, 2020; (2) no further visitation between mother and the minor was authorized

24

by the court thereafter; and (3) this court's reversal of the order terminating parental rights occurred on December 18, 2020.

As to the first element of visitation and contact, "[t]he question is just whether 'parents visit consistently,' *taking into account 'the extent permitted by court orders.'* [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632, italics added.) Under the circumstances of this case—where the Department stipulated that mother had regularly visited the minor up to the juvenile court's issuance of the original order terminating parental rights, and thereafter there was a nearly one-year hiatus in visitation because of the pendency of an appeal challenging that order—we reject the Department's claim that she failed to establish the first element of the parental-benefit exception.

### 2. *Beneficial Relationship & Detriment*

In the statements preceding its ruling, the juvenile court did not provide a separate analysis regarding whether mother had established the second and third elements of the parental-benefit exception, namely, whether "the child would benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)), and "the termination of parental rights would be *detrimental* to the child" (*Caden C.*, *supra*, 11 Cal.5th at p. 631, original italics). We therefore address these elements together here.[10]

---

[10] The Supreme Court In *Caden C.* explained that the exception involved a three-element analysis in which "[t]he parent must show [1] regular visitation and contact with the child . . . [2] the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship . . . [and 3] that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Prior case law discussing the parental-benefit exception had essentially collapsed the second and third elements by describing the juvenile court's inquiry as having "two prongs, i.e., regular visitation and benefit to the minors of continued contact with the parents that outweigh[] the benefits of adoption." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212; see also *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396-397, disapproved on other grounds in *Caden C.*, *supra*, at p. 638, fn. 7.)

### a. "Significant Parental Role" Requirement

We first address mother's contention that the juvenile court erred by imposing a requirement that mother establish that she occupied a parental role in the minor's life. The juvenile court in announcing its ruling stated that "[t]o meet the second prong, the parent must establish by a preponderance of the evidence that *she serves in a significant parental role* and it is to her that the child turns for his *daily* emotional and physical needs to ensure that his medical and dental needs are met, for guidance, for a sense of safety and support, for the well-being that comes from having a supportive and structured home environment, with predictable routines and for a feeling of safety." (Italics added.) This statement mirrored the arguments made by counsel for the Department and for the minor. The court found that "[m]other has not provided the child with ongoing daily care and support," and that "[t]he prospective adoptive parents have been providing all of the child's daily care and nurturing."

As we have recently observed, the high court in *Caden C.*, *supra*, 11 Cal.5th 614 did not use the term " 'parental role,' " and its "holding . . . had nothing to do with whether the juvenile court or the Court of Appeal had considered mother or the caregivers to have occupied 'parental roles' (regardless of whether that precise phrase was used) in the child's life." (*A.L.*, *supra*, 73 Cal.App.5th at p. 1157.) But *Caden C.* did note that when the juvenile court assesses whether the child would benefit from a continuation of the parental relationship, the juvenile court "must remain mindful that rarely do 'parent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' [Citation.]" (*Caden C.*, *supra*, at p. 632.) "The application of the beneficial parent relationship exception requires a robust individualized inquiry given that . . . no single factor—such as supervised visitation or lack of day-to-day contact with a noncustodial parent—is dispositive." (*In re Grace P.* (2017) 8

26

Cal.App.5th 605, 613 (*Grace P.*).) The parent need not prove "that the child has a 'primary attachment' to a parent or that the noncustodial parent has maintained day-to-day contact with the child. [Citations.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 300.) Therefore, rather than the parent being required to show a paradigmatic relationship with the child such as serving in "a parental role," under *Caden C.*, the parent establishes the existence of a beneficial relationship (the second element) when "the child has a substantial, positive, emotional attachment to the parent." (*Caden C., supra,* at p. 636; see also *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 [exception applies where there is "a significant, positive, emotional attachment from child to parent"].)

The apparent requirement by the juvenile court here that mother establish "that she serves in a significant parental role and it is to her that the child turns for his daily emotional and physical needs" runs contrary to these principles. Under *Caden C.*, whether the child would benefit from continuing his or her relationship with the parent is not determined by applying a narrow view of the character of that relationship or "calibrat[ing] a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" ' " the parent provides to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "*Caden C.* . . . made clear that the type of relationship necessary to establish the exception is not narrowly defined or specifically identifiable, because parent-child relationships are endlessly varied. [Citation.]" (*In re J.D.* (2021) 70 Cal.App.5th 833, 865. (*J.D.*))

Further, the juvenile court's recital that the parent must show that she "serve[d] in a significant parental role" where the child turned to the parent to address his "daily emotional and physical needs" is problematic under *Caden C.* for an additional reason. The statement indicates, or at least suggests, that the exception will apply only where the parent is ready, or will ultimately be ready, to resume the role of custodial parent. The Supreme Court, however, held that the parent's capability of assuming a custodial role is not a required or relevant inquiry. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632, 638.)

Moreover, the juvenile court's statements—that "[m]other has not provided the child with ongoing daily care and support" followed almost immediately thereafter with "[t]he prospective adoptive parents have been providing all of the child's daily care and nurturing"—suggest that the court *may have* compared the respective caregiving skills of mother and the foster family in concluding that the parental-benefit exception did not apply. Such an approach would have been improper, as explained in *Caden C.*, decided one month after the juvenile court's ruling. (*Caden C.*, *supra*, 11 Cal.5th at p. 634 [juvenile court "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"].)[11]

Since the Supreme Court decided *Caden C.* last May, there have been several appellate decisions that have questioned the juvenile court's determination that the parental-benefit exception was inapplicable based upon reasoning that the parent had not assumed a "parental role." In *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 205 (*L.A.-O.*), the juvenile court found at the 366.26 hearing that the parental-benefit exception did not

_____

[11] In *A.L.*, *supra*, 73 Cal.App.5th at page 1157, a panel of this court rejected the father's position that the juvenile court, in determining the third element of detriment, had acted improperly by "consider[ing] whether, and to the extent to which, the caregivers and father occupied parental roles with the minor. In fact, the Supreme Court acknowledged that '[i]n many cases, "the strength and quality of the natural parent/child relationship" will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home.' [Citation.] Thus, the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." In *A.L.*, this court's focus was not upon the denial of the exception under the second element, because we concluded that the juvenile court had found the existence of a beneficial relationship between the father and child, and substantial evidence supported that finding. (*Id.* at p. 1155.) Our conclusion in *A.L.*, based upon the circumstances presented in that case, is consistent with our determination here that it appears that the juvenile court erred when it found that mother had not established the existence of a beneficial relationship, based upon requiring mother to have assumed "a significant parental role" and by apparently comparing the respective caregiving skills of mother and the foster family.

apply, concluding " '[the parents] have not acted in a parental role in a long time. . . . [T]he permanency that adoption would provide in the home that has been acting in a parental role outweighs the detriment of the termination of parental rights.' " The *L.A.-O.* court noted that the Supreme Court in *Caden C.*, had "cautioned that 'rarely do "[p]arent-child relationships" conform to an entirely consistent pattern. [Citations.] . . . [¶] *Caden C.* also held that, in applying the parental-benefit exception, 'the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)' " (*L.A.-O.*, *supra*, at p. 210, quoting *Caden C.¸ supra*, 11 Cal.5th at pp. 632, 634.) The *L.A.-O.* court observed that the term " parental role,' standing alone, can have several different meanings" (*L.A.-O.*, *supra*, at p. 210), and "[i]n the case law, . . . is defined largely in terms of what it is not" (*id.* at p. 211). The court thus concluded that because of its ambiguity, the term "parental role" should not be used "at all." (*Ibid.*) Based upon the juvenile court's comments in referencing that the parents had not played a "parental role" while the foster parents had done so, the *L.A.-O.* court reversed with directions that the juvenile court reconsider whether the parental-benefit exception applied, reasoning: "[The juvenile court] may have meant that the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents. That would be legally correct. However, from its reference to a long time, it seems to have meant that that were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care. That would be erroneous." (*Id.* at pp. 211-212.)

Similarly, in *In re D.M.* (2021) 71 Cal.App.5th 261, 270 (*D.M.*), the appellate court held the juvenile court had erred in finding that the father had not established the second element, the existence of a beneficial parental relationship. It concluded that the trial court had erroneously equated a " 'parental role' " with "attendance at [the children's] medical appointments, and understanding their medical needs." (*Ibid.*) "Instead, the focus is whether there is a substantial, positive emotional attachment

between parent and child." (*Ibid.*) The *D.M.* court thus reversed, reasoning that "[t]he court's express findings that father did not act like a parent demonstrate it considered factors which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies. [Citation.]" (*Id.* at p. 271; see also *J.D.*, *supra*, 70 Cal.App.5th at p. 865 [reversal required because it could not be discerned whether "juvenile court's determination that mother did not occupy a 'parental' role encompassed factors" that *Caden C.* deems irrelevant].)

Under the standards explained by the Supreme Court in *Caden C.,* decided one month after the juvenile court's ruling, we conclude that the juvenile court's requirement for the parental-benefit exception that a parent must "serve[] in *a significant parental role* . . . [in which] the child turns for his *daily* emotional and physical needs . . ." (italics added) was an erroneous statement of the law. To the extent that this erroneous statement of the law served as the basis for the court's finding that the parental-benefit exception did not apply, this constituted an abuse of discretion. (See *Doe 2 v. Superior Court* (2005) 132 Cal.App.4th 1504, 1517 [where court " 'applies the wrong legal standards applicable to the issue at hand,' " it abuses its discretion].)

### b.      Mother's Struggles with Substance Abuse

We address mother's further contention that the court erroneously based its finding that the parental-benefit exception did not apply upon mother's failure to address fully her substance abuse issues that had resulted in the dependency proceedings. The argument is based upon the following statement by the juvenile court: "Mother has not provided the child with ongoing daily care and support. She has relapsed throughout the course of the dependency and was observed to have fallen asleep at visits and to have been unable to safely parent, not removing a cigarette lighter from the child which was obtained during her visit." Mother's claim of error is also founded on other comments by the juvenile court concerning evidence of (1) her driving under the influence with the minor in the car (prior to the filing of the petition); (2) her substance abuse having dated

30

back to when she was 18 years old; and (3) her sobriety since October 2020 and her commitment to her recovery.

As noted, the Supreme Court held that "[a] parent's continued struggles with issues leading to dependency are not a categorical bar to applying the parental-benefit exception" (*Caden C.*, *supra*, 11 Cal.5th at p. 637), and those struggles "may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent" (*id.* at p. 638). But as the high court also noted, the issues that led to the dependency are nonetheless relevant in determining whether the exception applies insofar as they "may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child" (*id.* at p. 637), and "may also be relevant to the detriment from terminating parental rights" (*id.* at p. 638). From this record, we cannot conclude the juvenile court based its detriment finding upon mother's continued struggles with substance abuse or that it assigned blame or made moral judgments because of mother's past failings. The court's comments about mother's having suffered relapses throughout the dependency, her past substance abuse, and her recent sobriety, without an indication that her substance abuse history played a role in its finding the exception inapplicable, do not demonstrate a misapplication of the law.

The circumstances here are unlike those in *Caden C., supra*, 11 Cal.5th 614. There, the Supreme Court held that the Court of Appeal had erred by "treat[ing] the [parents'] lack of progress in addressing [their] substance abuse and mental health issues as a categorical bar to establishing the exception." (*Id.* at p. 626.) Here, the record does not support the position that the juvenile court determined that mother's lack of progress was a bar to finding that the exception applied.

Likewise, *In re B.D.* (2021) 66 Cal.App.5th 1218 (*B.D.*), relied on by mother, does not support her position. In *B.D.*, the juvenile court found that the parents had not established the second element of the parental-benefit exception. As indicated by the

31

*B.D.* court, the juvenile "court found the parents' substance abuse, and the impact this had on their ability to safely parent their children, to be their 'core issue.'" (*Id.* at p. 1227.) The appellate court reversed the order after the 366.26 hearing based upon the juvenile court's having "relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long term and continued substance abuse." (*Id.* at p. 1228.)

The record before us does not disclose error. The juvenile court's comments do not support mother's claim that "the juvenile court abused its discretion and erred as a [matter] of law when [it] found the exception could not apply because [m]other had not fully addressed her problems with substance abuse."

### 3. Whether Error Was Harmless[12]

An appellant must demonstrate both trial court error and that such error requires reversal. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 ["judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate . . . that the trial court committed an error that justifies reversal of the judgment"].) Under this concept of reversible error, the California Constitution provides that unless "the error . . . has resulted in a miscarriage of justice," an appellate court shall not set aside the judgment. (Cal. Const., art. VI, § 13.) Under the *Watson* standard, the appellate court concludes there has been a miscarriage of justice requiring reversal "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836

---

**12** Neither party addressed harmless error in the appellate briefs. Accordingly, this court requested that the parties submit supplemental letter briefs to address this issue. We have received the parties' supplemental briefs and have considered them in connection with our determination of whether the juvenile court's error was harmless.

(*Watson*).)  The Supreme Court has held that this *Watson* standard applies to dependency appeals.  (*In re Celine R.*, *supra*, 31 Cal.4th at p. 60.)

The determination of whether a beneficial relationship between parent and child exists is a factual matter; it does not involve a discretionary balancing of factors.  (*Caden C., supra*, 11 Cal.5th at p. 640 [whether the child would benefit from continuing the relationship with the parent "is . . . essentially a factual determination"].)  We will thus consider here whether the juvenile court's error in applying the wrong legal standard in concluding that mother had not established the existence of a beneficial relationship was harmless.  (See *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1452 [where "evidence on the appropriate issue was undisputed and supports a finding that there is no need for continued supervision," error in terminating jurisdiction by relying on incorrect statute was harmless].)

There was scant evidence here supporting the existence of a *current* relationship between mother and the minor that could be deemed beneficial, i.e., one disclosing that the minor "ha[d] a substantial, positive, emotional attachment to the parent."  (*Caden C., supra*, 11 Cal.5th at p. 636.)  Indeed, there was little evidence presented *at all* concerning the nature of the current relationship between mother and son.  Mother offered five witnesses at the 366.26 hearing (other than herself).  Two were mother's friends and one was her sponsor; none of the three had observed any interactions between mother and the minor that were more recent than the time of the child's removal three years before the 366.26 hearing.  Another witness (Brittney O.) offered no testimony concerning mother's relationship with the minor.  The fifth witness, Janet B., the maternal grandmother, did not offer any testimony about her daughter's current relationship with the minor other than her testimony that she had witnessed—while the child was visiting her and his half-sisters—approximately three telephone calls between mother and the minor beginning in February 2021.  Janet B. testified that the last call—occurring approximately two weeks before the hearing—terminated "because [the minor] did not want to talk to his mom."

33

Further, Janet B. testified that she had not witnessed the minor, after his removal, ever say anything about returning to live with mother.

The only evidence of the current relationship between mother and the minor was from two witnesses, mother and social worker Julian. Mother testified that she had supervised visits with her son after he was removed until September 2019. She testified that the minor told her on occasion that he wanted to return to live with her. The last planned in-person visit with her son was in January 2020. In July 2020, mother had a chance encounter with the minor and his caretaker at a store. The child ran to mother, called her "Mommy," gave her a hug, and said he loved her. At a meal with mother in July 2020—in a statement the court found as being subject to "speculation" as to what was meant—the minor told mother that "he's been waiting for this day." Mother testified that through the Department, she had had three telephonic visits with the minor beginning in February 2021. The first call lasted 20 minutes but the last two "ended really, really quickly" because the minor had wanted to play with his sisters. After the third call, the social worker told mother that the minor wanted to take a break from the calls.

Social worker Julian testified that after the last in-person supervised visit between mother and the minor on January 2, 2020, the minor had had no negative behaviors associated with his not seeing mother. Based upon her recent observations, the social worker described the relationship between mother and the minor as "a casual relationship."

Although mother presented evidence as to her pre-removal relationship with her son from the time of his birth to age four, there was little showing of what that relationship was like three years later when he was nearly seven. Mother provided no evidence, such as a bonding study, as to the nature and closeness of her *current* relationship with the minor. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 557 [observing that there had been "no bonding study or other evidence" supporting the mother's parental-benefit exception claim].) Her own testimony provided little information about

her current relationship with the minor. Mother herself testified that the last time she had put the minor to bed, bathed him, helped him with homework, or spoken with his teacher was in 2018. And she admitted that the minor essentially had little interest in visiting with her during their two most recent visits by telephone.

What is also absent from the record is evidence of efforts made by mother in 2020 to stay in contact with the minor. In 2020, the minor had regular contact, including Facetime visits, with his sisters, who lived with the maternal grandparents. From May 2020 forward, the minor was living with his new prospective adoptive family in Salinas, a city near mother's residence. While we acknowledge that as of January 28, 2020, parental rights had been terminated and the prior appeal was pending throughout the year, there was little evidence that mother in 2020 made efforts, either through the Department or by contacting the foster family, to visit or speak with the minor, to obtain information about how he was doing physically or emotionally, or to determine how he was doing in school.[13] It would seem that there would be a record of such minimal efforts by the parent if the relationship were indeed "substantial."

Mother contends, however, that the error requires reversal, asserting two alternative theories. First, she argues that the juvenile court's reliance upon "improper factors . . . constitutes an abuse of discretion and error as a matter of law, requiring reversal." We disagree. "[A] judgment in a dependency case should not be set aside unless it is reasonably probable the result would have been more favorable to the appealing party but for the error. [Citation.]" (*In re R.F.* (2021) 71 Cal.App.5th 459, 474.) Second, mother contends that, based upon several post-*Caden C.* decisions in

---

**13** We acknowledge that mother testified that she called social worker Julian on October 12, 2020, to inquire about the minor's adoption status, and called later that year to ask about seeing the minor for Christmas. Mother also testified that she called social worker Julian "like 80 times" over a time period not specified and that she did not speak to her on many of those occasions.

which orders terminating parental rights were reversed and remanded with directions to reconsider the parental benefit exception, the error in this instance cannot be deemed harmless. The cases relied on by mother include *D.M.*, *supra*, 71 Cal.App.5th 261, *J.D.*, *supra*, 70 Cal.App.5th 833, and *L.A.-O.*, *supra*, 73 Cal.App.5th 197.

The *D.M.* court held that the trial court had erroneously equated a " 'parental role' " with "attendance at [the children's] medical appointments, and understanding their medical needs," rather than "focus[ing on] . . . whether there is a substantial, positive emotional attachment between parent and child." (*D.M.*, *supra*, 71 Cal.App.5th at p. 270.) There was evidence presented in *D.M.* supporting the existence of a beneficial relationship, including the father's testimony that the children wanted to be returned to his care and the youngest child cried when the visits ended. (*Id.* at p. 271.) The appellate court held that it did "not find substantial evidence support[ed] the court's finding[] concerning the benefits to the children from continuing the relationship with father." (*Id.* at p. 270.) Although not explicitly stated, the appellate court's holding suggests that the *D.M.* court believed that there *was* substantial evidence that *would have* supported a finding that a beneficial relationship existed. The appellate court rejected the agency's harmless error argument, concluding simply, "We cannot know how the court would have exercised its discretion if it had the benefit of the *Caden C.* analysis when making its ruling." (*Id.* at p. 271.) Here, unlike in *D.M.*, we have concluded that there was no substantial evidence to support a finding concerning the existence of a beneficial relationship, and thus any finding that mother established this second element of the exception would have been improper. (See *In re J.P.* (2017) 15 Cal.App.5th 789, 799 [appellate court's consideration of whether error is harmless "is by definition a case-by-case analysis"].)

In *J.D.*, *supra*, 70 Cal.App.5th at page 855, the appellate court concluded, contrary to the juvenile court, that the "mother [had] presented evidence to support a finding that J.D. ha[d] a 'substantial, positive, emotional attachment' to her sufficient to meet the

second element [of the exception]." The *J.D.* court specifically rejected the agency's assertion that the mother had not satisfied the second element (*id.* at p. 859), going so far as to state that, were it not for some evidence that reflected negatively upon the mother, the evidence would have *compelled a finding* in the mother's favor concerning the existence of a beneficial relationship. (*Id.* at p. 862.) Although it does not appear that the agency argued harmless error, the appellate court concluded that, based on the record, it could not determine whether the juvenile court relied on improper factors (i.e., that there was a lack of a parental bond) in finding against mother on the second element. (*Id.* at pp. 863-864.) Here, we specifically find to the contrary—that there was no substantial evidence to support a conclusion in favor of mother as to the second element, the existence of a beneficial relationship.

And *L.A.-O.*, *supra*, 73 Cal.App.5th 197 does not undermine our conclusion that the error here was harmless. The appellate court held that, because the juvenile court's "ruling was terse . . . [and included the comment] that the parents 'ha[d] not acted in a parental role in a long time' " (*id.* at p. 211), it could not determine whether the decision was based upon factors that were "legally correct," requiring reversal (*ibid.*). It is not apparent that the agency asserted that any error was harmless, and the *L.A.-O.* court's conclusion was simply that "[b]ecause [the court] used this ['parental role'] terminology, we cannot tell whether its ruling conformed with *Caden C.*" (*Id.* at p. 202.) The appellate court did not analyze the juvenile court's findings in terms of whether substantial evidence was presented that would have supported a finding of the existence of a beneficial relationship. Here, we have conducted that analysis and find that mother did not carry her burden of establishing the second element of the exception.

In sum, we disagree with mother's claim that the error requires reversal. Whether the parental benefit exception to adoption applies is governed by the individualized facts of a given case. (See *Grace P.*, *supra*, 8 Cal.App.5th at p. 613 ["application of the . . . exception requires a robust individualized inquiry"].) Based upon the record before us,

37

we conclude that mother failed to establish the second element of the parental-benefit exception. There was no substantial evidence to support a finding that that there was a *present* beneficial relationship, i.e., that the minor "ha[d] a substantial, positive, emotional attachment to the parent." (*Caden C., supra*, 11 Cal.5th at p. 636.) Therefore, any error by the juvenile court in applying an incorrect legal standard in its determination regarding the parental-benefit exception was harmless. (Cf. *B.B. v. Superior Court* (2016) 6 Cal.App.5th 563, 573 [because there was "no reasonable probability the juvenile court would have found reunification efforts" would have been in child's best interests, agency's noncompliance with procedures under § 388 was harmless error].)

It is very apparent to this court that mother loves her son very much. It is clear, however, that, although under the principles enunciated by the Supreme Court in *Caden C.* decided one month after the hearing below, there was error by the juvenile court, that error was not one that "has resulted in a miscarriage of justice" warranting reversal. (Cal. Const., art. VI, § 13.)

### III.    DISPOSITION

The order of April 27, 2021, in which the juvenile court denied mother's claim concerning the parental-benefit exception to adoption and reinstated the court's prior order declaring adoption as the permanent plan for the minor and terminating parental rights, is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

DANNER, J.

*In re A.G.; DSS v. S.B.*
**H049183**